# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION AT DAYTON

| LUTHER MAGILL, | : | |
|---|---|---|
| Plaintiff, | : | |
| | | Case No. 3:08cv00167 |
| vs. | : | |
| | | District Judge Walter Herbert Rice |
| MICHAEL J. ASTRUE, | : | Magistrate Judge Sharon L. Ovington |
| Commissioner of the Social | | |
| Security Administration, | : | |
| Defendant. | : | |

## REPORT AND RECOMMENDATIONS[1]

## I.  INTRODUCTION

Plaintiff Luther Magill filed applications with the Social Security Administration seeking Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI). Through his applications, Plaintiff asserted that he was eligible to receive DIB and SSI because his health problems prevented him from working and therefore constituted "disability" within the meaning of the Social Security Act.

At each stage of administrative review, the Social Security Administration denied Plaintiff's DIB and SSI applications.  The most significant denial for purposes of the present case occurred in the decision of Administrative Law Judge (ALJ) Melvin A. Padilla, who held and a hearing, reviewed the evidence of record, and concluded that Plaintiff was not under a "disability" within the meaning of the Social Security Act. Based on Plaintiff's non-disability determination, ALJ Padilla further concluded that Plaintiff was not eligible to receive DIB or SSI.  (Tr. 17-26).  ALJ Padilla's non-disability

---

[1] Attached hereto is NOTICE to the parties regarding objections to this Report and Recommendations.

decision is subject to judicial review, *see* 42 U.S.C. §405(g), which Plaintiff is now due.

This case is before the Court upon Plaintiff's Statement of Specific Errors (Doc. #8), the Commissioner's Memorandum in Opposition (Doc. #9), the administrative record, and the record as a whole.

Plaintiff seeks an Order reversing the ALJ's decision and finding him under a disability beginning on January 21, 2005 and continuing through the present. Or Plaintiff seeks, at a minimum, a remand of this case to the Social Security Administration for a proper evaluation of medical source opinion and vocational evidence.

The Commissioner seeks an Order affirming the ALJ's decision.

## II. FACTUAL BACKGROUND

### A. Plaintiff and His Testimony

At the time of the ALJ's decision, Plaintiff's age (59 years old) placed him in the category of a "person of advanced age" for purposes of resolving his DIB and SSI applications. *See* 20 C.F.R. §§ 404.1563(e), 416.963(e); *see also* Tr. 25. He has a high school education with special education classes. (Tr. 64, 104, 285).

Plaintiff applied for DIB and SSI on July 28, 2004 asserting that he was under a "disability" beginning on June 1, 2003.

During the ALJ's administrative hearing, Plaintiff testified that he had last worked as a security officer for seven years until 2003. (Tr. 277-78, 284). He stopped working his last security job because "[t]hey went out of business." (Tr. 284; *see* Tr. 104, 1100).

In January 2005 Plaintiff was hit by a car while exiting a bus. (Tr. 278; *see* Doc. #8 at 4). He suffered two broken legs. (Tr. 278). After his accident in January 2005, Plaintiff underwent surgery on both legs. (Tr. 280). During his recovery, he stayed in a nursing home where he received physical therapy. (Tr. 279-80).

Plaintiff testified that he has been unable to do any job because of pain in his left, which causes him difficulty walking and carrying things. (Tr. 278-79, 285). He described his pain as a "dull ache." (Tr. 279). He also testified, "I can't carry bags of

groceries, heavy bags." (Tr. 279). And he experiences leg pain when he climbs stairs. (Tr. 282). Plaintiff explained that he wants to work but his "legs say no." (Tr. 285).

Plaintiff does not take any medication and does not receive any treatment for his leg pain. He does not wear a leg brace. (Tr. 279-81). He testified that he had no other problems besides his legs. (Tr. 280). He no longer sees any physician and does not go to any free clinic. *Id*.

Plaintiff estimated that he could walk for two hours at a time, stand for two hours at a time, sit six or seven hours at a time, and lift fifteen pounds. (Tr. 281). As to his daily activities, Plaintiff takes care of his personal needs, uses public transportation, cooks, washes dishes, sweeps, mops, vacuums, does laundry, shops, makes his bed, goes out to eat, goes to church, visits with family and friends, and watches television. (Tr. 281-84). He has no hobbies and does not exercise. (Tr. 283). He lives alone in an apartment and drives a car three times a week. (Tr. 276).

Plaintiff explained that for two years he had attempted to find a job with the assistance of the Bureau of Vocational Rehabilitation. He was unable to find a job but did not know why. (Tr. 285).

### B. Plaintiff's Accident and Injuries

Medical records concerning Plaintiff's hospitalization after the accident show that he suffered multiple injuries including right and left tibial fractures, a left patellar fracture, a splenic laceration, and a broken nose. (Tr. 148). He underwent an open reduction and internal fixation of the bilateral tibial fractures and closed treatment of the left patella fracture. He was discharged to an extended-care facility, the Elm Creek Nursing Center, because he could not stand or bear weight on both his legs. (Tr. 148-49).

Plaintiff spent the next six months at Elm Creek Nursing Center. (Tr. 204-63). While there, his medical care was managed by Thomas I. Kanomata, M.D. (Tr. 209-14) as well as physicians at an orthopedic clinic. (Tr. 185-263). In the initial months after his surgeries, Plaintiff needed to use a wheelchair and was non-weight bearing on his legs.

(Tr. 180, 197, 199).

On April 18, 2005, an orthopedist noted, "Today's x-rays demonstrate maintenance of alignment, reduction, and position of the implants. These are very severe plateau fractures, but he appears to be doing well at this time with evidence of radiographic healing." (Tr. 192). The orthopedist planned to have Plaintiff remain at the nursing facility and to begin weight bearing while weaning him off his leg braces. (Tr. 192).

By June 2005 Plaintiff was weight bearing without pain, walking with a walker, a progressing to use of a cane. (Tr. 186). He was discharged from the orthopedic clinic with follow-up as needed. (Tr. 186, 210). And one month later he was discharged from Elm Creek Nursing Center. (Tr. 204).

After examining Plaintiff on September 15, 2005, Dr. Kanomata wrote a letter stating that Plaintiff had recovered fairly well from his injuries, but he still had significant limitations. Dr. Kanomata noted that Plaintiff ambulated with a mild gait disturbance. He noted that any type of lifting would disturb his gait further and will cause him to fall. Dr. Kanomata further reported that Plaintiff had difficulty ambulating very long distances and experiences pain in his lower extremities after sitting for long periods of time. (Tr. 264).

Although Dr. Kanomata believed that Plaintiff had progressed very well, he could only maintain his independence at home at a limited level. Dr. Kanomata recommended that Plaintiff maintain his independence, but he opined that Plaintiff's ability to work is limited. Dr. Kanomata opined that Plaintiff should not lift or carry items greater than five pounds or perform activities that required prolonged standing, squatting, or crawling. He also reported that it would not be advisable for Plaintiff to use his lower extremities in activities that require repetitive movements. And Dr. Kanomata opined that Plaintiff was mentally restricted due to mental retardation and advised against stressful psychological activities. (Tr. 264).

4

### C. Other Evidence

In February 2004, before his accident, the Ohio Bureau of Vocational Rehabilitation referred Plaintiff for psychological evaluation by Ty Payne, Ph.D. (Tr. 104-07). Plaintiff told Dr. Payne that his health was good and that he took no medication. (Tr. 104). He denied having any mental health problems. *Id.*

Plaintiff also informed Dr. Payne that he was last employed in June 2003 in a security position, and he had worked that job since 1987. He indicated to Dr. Payne that he had "quit because he was not receiving enough hours." (Tr. 104).

Upon testing administered by Dr. Payne, Plaintiff scored a verbal IQ of 74, a performance IQ of 73, and a full scale IQ of 71. (Tr. 105). Dr. Payne reported that Plaintiff functioned in the "mildly impaired range for attention to visual detail, speed of performance combined with visual memory, using social cues to sequence events, social reasoning, math reasoning, and vocabulary development." (Tr. 105). Additional testing placed Plaintiff at the fourth-grade reading level, third-grade math level, and second-grade spelling level. Dr. Payne diagnosed Plaintiff with borderline mental retardation and limited basic achievement skills. (Tr. 107). He placed Plaintiff's GAF at 56, *id.*, referring to "moderate symptoms ... or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)."[2] Diagnostic and Statistical Manual of Mental Disorders, 4th ed., Text Revision at p. 34 (DSM-IV-TR).

Dr. Payne opined that Plaintiff would perform best in settings where "he has limited decision-making, limited record-keeping, and minimal reading of directions." (Tr. 107).

On two other occasions in 2004, two state agency psychologists, Guy G. Melvin,

---

[2] "GAF" (Global Assessment of Functioning) is a tool used by health care professional. It is, in general, a snapshot of a person's "overall psychological functioning" at or near the time of the evaluation. *See Martin v. Commissioner*, 61 Fed.Appx. 191, 194 n.2 (6th Cir. 2003); *see also* Diagnostic and Statistical Manual of Mental Disorders, 4th ed., Text Revision at 32-34.

Ph.D. and Jennifer E. Swain, Psy.D, reviewed the administrative record and concluded that Plaintiff's IQ testing was consistent with the diagnosis of borderline intellectual functioning and with his functional history. (Tr. 138). These medical sources further believed that Plaintiff "retains the ability to perform simple, routine, and repetitive tasks." *Id*. They also noted, "[Claimant's] statements are found to be credible with 3rd party information and objective findings." *Id*.

Plaintiff also underwent a vocational evaluation in May 2004. (Tr. 108-19). He reported that he would like to perform security work either on a full-time or a part-time basis. The majority of his test results were below average: for example, reading was at the fourth-grade level and arithmetic at the third-grade level. (Tr. 112, 116, 118). The vocational evaluator opined that Plaintiff "is an unlikely candidate for competitive employment" primarily due to his slow work speed and limited academic skills. (Tr. 110). The evaluator also thought that Plaintiff would "learn best in a hands-on, visual environment using modeling and repetition with 3-4 step tasks." (Tr. 110). And the evaluator opined, "Strong, individualized job coaching support in a simple, unskilled job with lowered production demands will yield Luke's best prospects for community employment." (Tr. 110).

In November 2004 Plaintiff underwent a ten-day situational assessment through United Rehabilitation Services. (Tr. 139-46). During the assessment, Plaintiff worked six hours a day performing general stocking duties at a retail store. He worked with intermittent supervision and was able to receive simple direction. He was ill one day and failed to call in. He performed his work "with good effort and was cooperative." (Tr. 145). The most significant areas of concern related to "basic work skills and attendance and adaptive functioning (inappropriately coping with absence from work)." (Tr. 145-46). The evaluator recommended Plaintiff as a candidate for job placement and on-site job coaching services. The evaluator explained, "Job Coaching will need to focus on learning a more complex job, due to Mr. Magill's learning difficulties." (Tr. 146).

6

In March 2006 – more than one year after his accident – Plaintiff underwent job coaching, in which he worked five hours a day doing small parts assembly (placing rubber grommets on wires). (Tr. 92-103). His strengths were many: he had excellent personal and work attitude and good attendance; he could accept criticism, redirection, and supervision; he had acceptable work rate; he asked appropriate questions when in doubt; he was energetic and willing to help; he had good motor skills; he could work and talk at the same time; he accepted praise appropriately; and he worked at a steady pace. (Tr. 102). His weaknesses included poor hygiene, transportation issue and issues with speed. (Tr. 103). The vocational counselor recommended that Plaintiff attend job development for assistance in searching for a job. *Id*. And the counselor felt that Plaintiff would need job coaching "to provide direct support and training to ensure consumer has complete understanding of all job duties, no attire and hygiene issues arise, and consumer is communicating appropriately with employer, customers, and co-workers." *Id*.

### III.  STANDARDS OF REVIEW

#### A.  **Administrative Review**

The definition of the term "disability" is essentially the same for both DIB and SSI. *See Bowen v. City of New York*, 476 U.S. 467, 469-70 (1986). Narrowed to its statutory meaning, a "disability" includes only physical or mental impairments that are both "medically determinable" and severe enough to prevent the applicant from (1) performing his or her past job and (2) engaging in "substantial gainful activity" that is available in the regional or national economies. *See Bowen*, 476 U.S. at 469-70 (1986). A DIB/SSI applicant bears the ultimate burden of establishing that he or she is under a disability. *See Key v. Callahan*, 109 F.3d 270, 274 (6th Cir. 1997); *see Wyatt v. Secretary of Health and Human Services*, 974 F.2d 680, 683 (6th Cir. 1992); *see also Hephner v. Mathews*, 574 F.2d 359, 361 (6th Cir. 1978).

Social Security Regulations require ALJs to resolve a disability claim through a five-Step sequential evaluation of the evidence. *See* Tr. 23-31; *see also* 20 C.F.R.

§§404.1520(a)(4), 416.920(a)(4).[3] Although a dispositive finding at any Step terminates the ALJ's review, *see also Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the evaluation answers five questions:

1. Is the claimant engaged in substantial gainful activity?

2. Does the claimant suffer from one or more severe impairments?

3. Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments (the Listings), 20 C.F.R. Subpart P, Appendix 1?

4. Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?

5. Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. §416.920(a)(4); *see also Colvin*, 475 F.3d at 730; *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

### B. <u>Judicial Review</u>

Judicial review of an ALJ's decision determines whether substantial evidence in the administrative record supports the ALJ's factual findings. *Bowen v. Comm'r. of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007). "Substantial evidence is defined as 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Bowen*, 478 F3d at 746 (citing in part *Richardson v. Perales*, 402 U.S. 389, 401 (1977)). It consists of "more than a scintilla of evidence but less than a preponderance..." *Rogers v. Comm'r. of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). Judicial review for substantial evidence is deferential not *de novo*. *See Cruse v.*

---

[3] The remaining citations will identify the pertinent SSI Regulations with full knowledge of the corresponding DIB Regulations. Plaintiff meets the insured-status requirement for DIB eligibility through December 2008. *See Colvin*, 475 F.3d at 730; *see also* Tr. 36.

*Commissioner of Social Sec*. 502 F.3d 532, 540 (6th Cir. 2007); *see also Cutlip v. Secretary of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). The Court's agreement or disagreement with the ALJ's findings plays no role in the substantial evidence review, and no significance attaches to contrary evidence in the record – if other substantial evidence supports the ALJ's findings. *Rogers*, 486 F.3d at 241; *see Her v. Comm'r. of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999).

Reviewing for substantial supporting evidence is not the stopping point of judicial analysis. Courts also examine the administrative decision to determine whether the ALJ applied the correct legal criteria. *See Bowen*, 478 F.3d at 746. If the ALJ did not, the decision may not be upheld even when substantial evidence supports the ALJ's findings. *See id.* For example, a decision will not be upheld where the ALJ failed to apply the standards mandated by the Social Security Regulations and where that failure prejudices a claimant on the merits or deprives the claimant of a substantial right. *See Bowen*, 478 F.3d at 746 (and cases cited therein). Through *Bowen* and other recent Sixth Circuit cases, an ALJ's failure to apply the correct legal criteria – at least when evaluating medical source opinions – mandates further judicial review for harmless error. *Bass II v. McMahon*, 499 F.3d 506, 512 (6th Cir. 2007); *see Bowen*, 478 F.3d at 747-49; *see also Wilson*, 378 F.3d at 547-49 (offering examples of possible *de minimis* errors). Consequently, if the ALJ erred by not applying the correct legal criteria but the error was harmless, the decision should be affirmed. *See Bass II*, 499 F.3d at 512 (and cases cited therein).

**IV.  ALJ PADILLA'S DECISION**

ALJ Padilla determined at Step 1 that Plaintiff has not engaged in substantial gainful activity since June 1, 2003. (Tr. 20).

At Step 2 the ALJ found that Plaintiff had the severe impairments of borderline intellectual functioning and residuals of bilateral leg fractures since January 2005. *Id.*

The ALJ concluded at Step 3 that Plaintiff's impairments did not meet or equal one

9

the criteria of a Listing-level impairment. (Tr. 21).

At Step 4 the ALJ found that Plaintiff had the residual functional capacity (RFC) to perform a reduced range of medium work.[4] The ALJ described his specific findings as follows:

> [T]he claimant has the residual functional capacity to: lift up to fifty pounds occasionally and twenty five pounds frequently; he must have the option to alternate positions as needed; he must avoid jobs requiring constantly being on his feet; use of foot controls; and he is limited to simple, repetitive tasks.

(Tr. 21). The ALJ also determined at Step 4 that while the Plaintiff is credible that he has "severe" impairments, his statements concerning the intensity, persistence and limiting effects of his impairments were not entirely credible. (Tr. 24).

The above conclusions, along with the ALJ's findings throughout his sequential evaluation, led him to conclude that Plaintiff was not under a disability and hence not eligible for DIB or SSI. (Tr. 17-26).

## V. DISCUSSION

### A. Plaintiff's Contentions

Plaintiff points out that in light of his age at the time of the ALJ's decision and given his lack of transferable vocational skills, he is disabled even if he could perform the full range of light work pursuant Rules 202.02 and 202.06 of the Medical-Vocational Guidelines, 20 C.F.R. Subpart P, Appendix 2.

Plaintiff contends that the ALJ erred by basing his RFC assessment on his own lay opinions rather than on a medical opinion. Plaintiff emphasizes that the ALJ's reasons for rejecting the opinions of his treating physician, Dr. Kanomata, were inadequate, particularly where the record does not contain a medical opinion contrary to

---

[4] The Regulations define medium work as involving the ability to lift "no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds...." 20 C.F.R. §416.967(c).

10

Dr. Kanomata's opinion. And, according to Plaintiff, the ALJ's "claim that the durational requirement was not met is not supported by any medical evidence." (Doc. #8 at 11). Plaintiff also contends that both Dr. Kanomata's opinions and his own testimony are consistent with a limited range of light work, at best.

  B. <u>**Medical Source Opinions**</u>

  Social Security Regulations require ALJs to evaluate every medical opinion of record regardless of its source. *See* 20 C.F.R. §416.927(d). The required evaluation focuses first on treating medical sources, whose opinions are entitled to controlling weight only when they are (1) well supported by medically acceptable data and (2) not inconsistent with other substantial evidence of record. 20 C.F.R. §416.927(d)(2); *see Wilson v. Commissioner of Social Security*, 378 F.3d 541, 544 (6th Cir. 2004). If a treating physician's opinion is not given controlling weight, then it must be weighed against other medical source opinions under a number of factors set forth in the Commissioner's Regulations – "namely, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source – in determining what weight to give the opinion." *Wilson*, 378 F.3d at 544 (citing 20 C.F.R. §404.1527(d)(2)).

  In general, more weight is given to the opinions of examining medical sources than is given to the opinions of non-examining medical sources. *See* 20 C.F.R. §416.927(d)(1). However, the opinions of non-examining state agency medical consultants have some value and can, under some circumstances, be given significant weight. This occurs because the Commissioner views nonexamining sources "as highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the [Social Security] Act." Social Security Ruling 96-6p. The opinions of non-treating physicians are weighed under the same factors as treating physicians including supportability, consistency, and specialization. *See* 20 C.F.R.

§416.927d), (f).

C. <u>**Analysis**</u>

Dr. Kanomata treated Plaintiff after his accident, from January 2005 through September 2005. In September 2005 Dr. Kanomata wrote a letter effectively finding that Plaintiff could only perform a limited range of light work. (Tr. 264-65).

The ALJ rejected Dr. Kanomata's opinions as follows:

> Dr. Kanomata provided no treatment records or any evidence of examinations or visits with the claimant since he was in the nursing home. He refers to 'your last visit on September 15, 2005,' but provides no actual medical report or even visit note from that time. Further, this [Dr. Kanomata's] letter dated September 2005 is less than a full nine months after the leg injuries. There are no medical records after the date of this letter. The durational requirement of twelve months is not met.
>
> Dr. Kanomata described only 'mild' gait disturbance. No specific testing is documented or any discussion of objective factors such as strength in the legs, range of motion, or any evidence of neurosensory deficits. Notably, the claimant had no ambulation aid at the hearing.
>
> Though Dr. Kanomata was an apparent treating source at the nursing home for several months, this was only for general complaints. The claimant's orthopedic condition was regularly evaluated by orthopedic specialists..., and no opinion on the issue of disability by any orthopedic source was submitted into evidence.

(Tr. 21-22)(internal citation omitted).

The ALJ's discussion indicates that he rejected Dr. Kanomata's opinions by applying the legal criteria set forth in the Regulations, particularly by noting the absence of supporting medical reports or testing and by noting Dr. Kanomata's failure to discuss or explain what medical testing or data supported his conclusion. As a result, the ALJ did not err as a matter of law when rejecting Dr. Kanomata's opinions. *See* 20 C.F.R. §416.927(d)(2)-(5).

Contrary to Plaintiff's contentions, the ALJ did not commit the error of relying

12

only on his own lay medical opinion regarding medical issues when rejecting Dr. Kanomata's opinions. Instead, the ALJ evaluated Dr. Kanomata's opinions under the applicable regulatory factors and substantial evidence supports the ALJ's application of those factors as the basis for rejecting Dr. Kanomata's opinions. For example, as the Commissioner correctly recognizes, Dr. Kanomata provided his disability opinions after seeing Plaintiff while he was in the nursing home for six months and then again in September 2005. (Doc. # 9 at 7; *see* Tr. 21, 209, 212-14). This relatively brief period of treatment constituted a valid reason for not fully crediting Dr. Kanomata's opinions. *See* 20 C.F.R. §416.927(d)(2) ("Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion."). In addition, a review of the letter Dr. Kanomata wrote in September 2005 reveals that he did not refer any particular medical/clinical findings (x-ray or MRI reports), in support of his opinion. *See* Tr. 264.

      Plaintiff further contends that the ALJ erred by rejecting his testimony about the severity of his leg pain and impairments, especially his testimony that he could lift 15 pounds and walk/stand for 2 hours at a time consistent with a limited range of light work.

      "'There is no question that subjective complaints of a claimant can support a claim for disability, if there is also evidence of an underlying medical condition in the record.'" *Cruse v. Commissioner of Social Sec.*, 502 F.3d 532, 542 (6th Cir. 2007) (quoting *Jones v. Comm'r. of Soc. Sec.*, 336 F.3d 469, 475 (6th Cir. 2003) (other citation omitted). Yet "'an ALJ is not required to accept a claimant's subjective complaints and may ... consider the credibility of a claimant when making a determination of disability.'" *Cruse*, 502 F.3d at 542 (quoting *Jones*, 336 F.3d at 476)(other citation omitted). "Notably, an ALJ's credibility determinations about the claimant are to be given great weight, 'particularly since the ALJ is charged with observing the claimant's demeanor and credibility.'" *Cruse*, 502 F.3d at 542 (citations omitted). An ALJ's credibility determinations must be supported by substantial evidence. *Id*.

13

Contrary to Plaintiff's contentions, substantial evidence supports the ALJ's credibility determination. The ALJ reasonably found that certain factors undermined Plaintiff's credibility. *See* Tr. 24. Security Ruling 96-7p. 1996 WL 374186. The ALJ correctly recognized that the record does not contain evidence indicating that Plaintiff stopped working in June 2003 due to any impairment. *Id.* The ALJ also found it significant that Plaintiff was looking for work and vocational services was assisting him in his job search before he had his accident in January 2005. (Tr. 24, 108-19, 139-46). *See* 20 C.F.R. § 416.929(c)(4) (consideration given to whether there are inconsistencies in the evidence and any conflicts between the claimant's statements and the other record evidence in determining the extent to which the claimant's symptoms diminish his capacity for basic work activities).

As noted above, the clinical notes of the treating physician, Dr. Kanomata contain few objective findings. The ALJ further recognized that after Plaintiff's accident, "there is no evidence of sustained difficulties with this condition lasting for at least twelve months. He was released from the nursing home in July 2005. There is no evidence of any medical treatment since then or objective evidence that he has continued to have any significant problems or any deficits in physical functioning." (Tr. 24).

The Regulations provide that in assessing credibility, the Commissioner may consider a variety of factors including daily activities. 20 C.F.R. § 416.929. In the present case, Plaintiff's self-reported activities include driving, cooking, doing laundry, performing household chores, visiting others, attending church, using public transportation, shopping and looking for work. (Tr. 281-85) . Those activities are inconsistent with an allegation of total disability. Plaintiff also takes no medication. (Tr. 279-81).

Plaintiff further argues that the ALJ's credibility assessment was "almost nonexistent." (Doc. #8 at 11). Although the ALJ's decision did not include a thorough discussion of Plaintiff's credibility, the ALJ's decision sufficiently indicates that he

14

considered Plaintiff's testimony and sufficiently explained why he did not credit Plaintiff's testimony. *See* Tr. 22-24. Indeed, the record tends to show that Plaintiff stopped working as a security officer in 2003 for reasons unrelated to a physical or mental impairment. To his credit, Plaintiff thereafter sought assistance from the Ohio Bureau of Rehabilitation Services in getting new vocational training to increase his ability to re-enter the workforce. This process was unfortunately interrupted by his accident in January 2005 and his recovery period over the ensuing months. Yet the record contains substantial evidence to support the ALJ's conclusion that Plaintiff's leg injuries did not meet the one-year durational requirement required for DIB and SSI eligibility. As the ALJ correctly noted, for example, "There is no evidence of any medical treatment since then [July 2005] or objective evidence that he has continued to have any significant problems or any deficits in physical functioning." (Tr. 24). Given the lack of such evidence, the ALJ's credibility determination is entitled to great deference. *See Walters v. Comm'r. of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997).

Lastly, because the ALJ's assessment of Plaintiff's Residual Functional Capacity – at the limited range of medium work – was supported by substantial evidence and not flawed by an error of law, the ALJ did not err by declining to apply the Medical-Vocational Guidelines, Rules 202.02 and 202.06, since these Rules apply only to those of advanced age who can only perform light work. *See Wright v. Massanari*, 321 F.3d 611, 615 (6th Cir. 2003) (claimant's characteristics must exactly match the criteria in Grid Rules to trigger a disability finding).

Accordingly, for all the above reasons, Plaintiff's Statement of Errors lacks merit.

**IT IS THEREFORE RECOMMENDED THAT:**

1. The Commissioner's final non-disability decision be affirmed; and

2. The case be terminated on the docket of this Court.

June 23, 2009                                         s/Sharon L. Ovington
                                                                                Sharon L. Ovington
                                                                      United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within ten days after being served with this Report and Recommendations. Pursuant to Fed. R. Civ. P. 6(e), this period is extended to thirteen days (excluding intervening Saturdays, Sundays, and legal holidays) because this Report is being served by mail. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within ten days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See United States v. Walters,* 638 F.2d 947 (6th Cir. 1981); *Thomas v. Am,* 474 U.S. 140 (1985).